1   PETER K. HUSTON (SBN 150058)
    phuston@sidley.com
2   MENESH PATEL (SBN 241072)
    menesh.patel@sidley.com
    Sidley Austin LLP
3   555 California Street, Suite 2000
    San Francisco, California 94104
    Telephone: (415) 772-1200
4   Facsimile: (415) 772-7400

5   WILLIAM BLUMENTHAL (pro hac vice to be filed)
    wblumenthal@sidley.com
    KAREN KAZMERZAK (pro hac vice to be filed)
6   kkazmerzak@sidley.com
    Sidley Austin LLP
    1501 K Street, N.W. #600
7   Washington, D.C. 20005
    Telephone: (202) 736-8000
    Facsimile: (202) 736-8711
8
    BRADLEY ELLIS (SBN 110467)
9   bellis@sidley.com
    KIMBERLY DUNNE (SBN 142721)
    kdunne@sidley.com
10  MARK HADDAD (SBN 205945)
    mhaddad@sidley.com
    HELENA TSEREGOUNIS (SBN 287422)
11  htseregounis@sidley.com
    Sidley Austin LLP
12  555 W Fifth Street #4000
    Los Angeles, CA 90013
    Telephone: (213) 896-6000
13  Facsimile: (213) 896-6600

    Attorneys for Tribune Publishing Company
14

15                    UNITED STATES DISTRICT COURT

16                   CENTRAL DISTRICT OF CALIFORNIA

                            WESTERN DIVISION

17  UNITED STATES OF AMERICA,          )   Case No. 2:16-cv-01822
                                       )
18              Plaintiff,             )
                                       )   **OPPOSITION OF DEFENDANT**
    v.                                 )   **TRIBUNE PUBLISHING**
19                                     )   **COMPANY TO PLAINTIFF'S**
    TRIBUNE PUBLISHING COMPANY,        )   **APPLICATION FOR TEMPORARY**
                                       )   **RESTRAINING ORDER**
20              Defendant.             )
                                       )
                                       )

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................1

II. STATEMENT OF FACTS ....................................................................5

    A.    The Parties..................................................................................5

    B.    The Bankruptcy and Auction Process.......................................5

    C.    The Industry ...............................................................................7

III. ARGUMENT.......................................................................................9

    A.    The Temporary Restraining Order Standard.............................9

    B.    Plaintiff is Not Likely to Succeed on the Merits...................12

        1.    Plaintiff Is Not Likely to Succeed on Its Proposed Relevant Market........................................................................13

        2.    Plaintiff Is Unlikely to Be Able to Demonstrate High Market Shares or a Substantial Increase in Concentration.......17

        3.    Plaintifff Is Unlikely to Be Able to Demonstrate Anticompetitive Effects ...........................................................18

    C.    The Public Will Not Suffer Irreparable Harm .....................19

    D.    The Balance of Equities Tips Decidedly Against the Grant of A TRO..........................................................................................21

    E.    The Government Has Long Known About the Potential Transaction ...............................................................................24

IV. CONCLUSION ..................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*All. for Wild Rockies v. Cottrell*,
  622 F.3d 1045 (9th Cir. 2010), *rev'd on other grounds*, 632 F.3d 1127
  (9th Cir. 2011) .................................................................................................10

*All. for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) .......................................................................10

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
  750 F.2d 1470 (9th Cir. 1985) .......................................................................11

*Am. Trucking Ass'n, Inc. v. City of Los Angeles*,
  559 F.3d 1046 (9th Cir. 2009) .......................................................................10

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993).......................................................................................18

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962).......................................................................................14

*California v. Am. Stores Co.*,
  872 F.2d 837 (9th Cir. 1989), *rev'd on other grounds*, 495 U.S. 271
  (1990)...............................................................................................................13

*Caribbean Marine Services Co., Inc. v. Baldrige*
  844 F.2d 668 (9th Cir. 1988) .......................................................................10

*Financial & Sec. Products Ass'n v. Diebold, Inc.*
  2005 WL 1629813 (N.D. Cal.) .....................................................................10

*In re Freedom Communications Holdings, Inc.*,
  Case No. 09-13046 (Bankr. D. Del. Sept. 1, 2009)....................................5

*Frontline Med. Assocs., Inc. v. Coventry Healthcare Worker's Comp.*,
  *Inc.*,
  620 F. Supp. 2d 1109 (C.D. Cal. 2009) .......................................................9

*FTC v. Freeman Hosp.*,
  69 F.3d 260 (8th Cir. 1995) .........................................................................13

*FTC v. H.J. Heinz*,
　246 F.3d 708 (D.C. Cir. 2001)................................................................13

*FTC v. Staples, Inc.*,
　970 F. Supp. 1066 (D.D.C. 1997)..........................................................14

*FTC v. Swedish Match*,
　131 F. Supp. 2d 151 (D.D.C. 2000).......................................................13

*FTC v. Tenet Health Care Corp.*,
　186 F.3d 1045 (8th Cir. 1999) .......................................................12, 18

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers
　Local No. 70 of Alameda Cty.*,
　415 U.S. 423 (1974)................................................................................9

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
　466 U.S. 2, 31 (1984), *abrogated on other grounds by Illinois Tool
　Works, Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006)..............................18

*Johnson v. Macy*,
　No. CV 15-7165 FMO (ASX), 2015 WL 7351538 (C.D. Cal. Nov. 16,
　2015) ......................................................................................................9

*IGT v. Alliance Gaming Corp.*, 702 F.3d 1138, at 1346-47 (Fed. Cir.
　2012) .....................................................................................................14

*In re Live Concert Antitrust Litig.*,
　863 F. Supp. 2d 966 (C.D. Cal. 2012) ...................................................18

*Los Angeles Memorial Coliseum Commission v. National Football
　League*,
　634 F.2d 1197,1201 (9th Cir. 1980) ......................................................11

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
　475 U.S. 574 (1986)...............................................................................18

*Reilly v. Hearst Corp.*,
　107 F. Supp. 2d 1192 (N.D. Cal. 2000).............................................3, 16

*SATA GmbH & Co. Kg v. Wenzhou New Century Int'l, Ltd.*,
　No. CV 15-08157-BRO (EX), 2015 WL 6680807 (C.D. Cal. Oct. 19,
　2015) ......................................................................................................10

- iii -

*Sierra On-Line, Inc. v. Phoenix Software, Inc.*,
   739 F.2d 1415 (9th Cir. 1984) ............................................................10

*Times-Picayne Publ'g Co. v. U.S.*,
   345 U.S. 594 (1953)...........................................................................15

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
   142 F.3d 90 (2d Cir. 1998) ................................................................18

*U.S. Philips Corp. v. KBC Bank N.V.*,
   590 F.3d 1091 (9th Cir. 2010) .............................................................9

*U.S. v. Citizen Publ'g Co.*,
   394 U.S. 131 (1969)...........................................................................15

*U.S. v. Syufy Enters.*,
   712 F. Supp. 1386-87 (N.D. Cal. 1989), *aff'd*, 903 F.2d 659 (9th Cir.
   1990) .............................................................................................15, 18

*United States v. Baker Hughes Inc.*,
   908 F.2d 981 (D.C. Cir. 1990)......................................................12, 13

*United States v. Bazaarvoice, Inc.*,
   No. 13-cv-00133, 2014 U.S. Dist. LEXIS 180347 (N.D. Cal. Dec. 2,
   2014) ................................................................................................21

*United States v. Engelhard Corp.*,
   970 F. Supp. 1463 (M.D. Ga. 1997), *aff'd*, 126 F.3d 1302 (11th Cir.
   1997) ................................................................................................14

*United States v. General Dynamics Corp.*,
   415 U.S. 486 (1974)...........................................................................17

*United States v. Marine Bancorporation, Inc.*,
   418 U.S. 602 (1974)...........................................................................12

*United States v. Oracle Corp.*,
   331 F. Supp. 2d 1098 (N.D. Cal. 2004).................................13, 14, 18

*United States v. SunGard Data Sys., Inc.*,
   172 F. Supp. 2d 172 (D.D.C. 2001)....................................................12

*Unites States v. Times Mirror Co.*,
   274 F. Supp. 606 (C.D. Cal. 1967).....................................................15

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7 (2008)................................................................................9, 10

**Statutes**

15 U.S.C. § 26...........................................................................................11

**Other Authorities**

"Dynamic Competition in the Newspaper Industry," Address to The
    Newspaper Association of America by Christine Varney, Assistant
    Attorney General, Antitrust Division, U.S. Department of Justice,
    Available at https://www.justice.gov/atr/speech/dynamic-competition-
    newspaper-industry.......................................................................8

Justice Department and Bazaarvoice Inc. Agree on Remedy to Address
    Bazaarvoice's Illegal Acquisiton of PowerReviews, reprinted at
    https://www.justice.gov/opa/pr/justice-department-and-bazaarvoice-
    inc-agree-remedy-address-bazaarvoice-s-illegal-acquisition...............................20

# I. INTRODUCTION

Although the Department of Justice claims to seek "temporary" relief, if the Court grants its application, the effect will be permanent. The unavoidable consequence of even a "temporary" order restraining Tribune Publishing Company ("Tribune") from seeking Bankruptcy Court approval of its auction-winning offer to acquire the bankrupt *Orange County Register* and *Riverside Press-Enterprise* will result in those papers either being acquired in the next several days by another bidder or liquidating, with irreparable harm to Tribune, the creditors of the bankrupt estate and the public. That does not preserve the status quo—it destroys it.

In November, 2015, Freedom Communications, Inc. ("Freedom"), owner of the *Orange County Register* and *Riverside Press-Enterprise*, for the second time in four years, filed for bankruptcy protection. On March 16, 2016, under a well-publicized process carefully supervised by the Honorable Mark S. Wallace, United States Bankruptcy Judge, Central District of California, Tribune, which publishes the *Los Angeles Times* and *San Diego Union-Tribune* (among other newspapers), won an auction to purchase Freedom's assets. Tribune's offer was substantially higher than that of the only other bidder, which not only provides far greater value for the creditors, but reflects the value of the assets to Tribune.

Tribune's interest in purchasing the *Orange County Register* and *Riverside Press-Enterprise* cannot have been a surprise to the government. Its interest in

acquiring Freedom's assets through the Bankruptcy Court process has been open and notorious for months. Declaration of Kenneth P. Kansa, ¶ 2. It has been the subject of national press reports as well as local press reports in New York, Washington, DC, Los Angeles, and elsewhere. Tribune has appeared repeatedly in open court to declare its interest in acquiring Freedom's assets.

Yet, the government showed no interest in the matter until March 8, 2016, just days before the scheduled auction. Now, at the eleventh hour, the DOJ seeks to permanently destroy Tribune's ability to acquire these assets, relying on antiquated notions of the relevant market and what competition means in the newspaper industry in today's digital world with its plethora of sources of news content and advertising platforms.

The government's request, if granted by this Court, effectively removes Tribune altogether from the proceedings in the Bankruptcy Court. The temporary private financing that allows the *Orange County Register* and the *Riverside Press-Enterprise* to operate expires March 31, 2016, and so the bankruptcy court must and shall award the assets to the highest eligible bidder at a sale hearing in the Bankruptcy Court this Monday. A temporary restraint on Tribune would ensure that it will not acquire the properties. Such a restraint also would circumvent the Bankruptcy Court's orderly sale process and eliminate this Court's ability to decide the issues on a full record. That result is unfair, and would harm not only Tribune, but also the creditors who

1   would be forced to accept a far inferior offer for the assets.  Declaration of James D.

2   Decker, ¶ 6.  On the other hand, if the Court denies the requested relief, the

3   government still has its remedy – it can pursue its case against Tribune, and, if it is

4   successful – a highly unlikely outcome – it can unwind the deal.

5        The government's effort to enjoin Tribune's acquisition of Freedom is

6   misguided on the merits and cannot meet its high burden for several reasons.  First,

7   the government relies on severely outdated notions of the relevant market.  In this day

8   and age, newspapers cannot be reasonably considered to be their own relevant product

9   market, notwithstanding the cases from the 1950s and 1960s cited by the government.

10   As the Honorable Vaughan Walker made clear 15 years ago, that notion has lost any

11   meaning in today's diverse media market.  *Reilly v. Hearst Corp.*, 107 F. Supp. 2d

12   1192, 1200 (N.D. Cal. 2000).  The tenuous economic assumptions that underlie the

13   government's assertions of competitive harm weigh strongly against a rush to

14   judgment in the form of emergency relief.

15        Second, the government also relies on highly speculative claims of harm to

16   newspaper readers and advertisers in Orange County and Riverside County.  The

17   evidence shows that neither readers nor advertisers of the *Los Angeles Times* and the

18   *Orange County Register* would be harmed if the papers were jointly owned.

19   Tribune's offer was higher than the competing offer for good reason:  the properties

20   are more valuable to Tribune than to others, because synergies with Tribune's

1    operations make it more likely that Tribune will be able to operate these properties

2    profitably and productively well into the future, unlike prior ownership, and to the

3    public's benefit.  *See* Declaration of William P. Hall, Exhibit A, p. 5.

4         Finally, and most fundamentally, the government overlooks the irreparable

5    harm that its own request for temporary relief inevitably will cause.  If this Court were

6    to enjoin Tribune from proceeding with the acquisition, that order would be the death-

7    knell to Tribune's offer.  Given the certain expiration of private financing for the

8    newspapers on March 31, 2016, the Bankruptcy Court and the creditors of Freedom's

9    bankruptcy estate may have no choice on Monday but to turn to the inferior offer.

10   This not only will end any chance for Tribune's offer to be accepted, but will result in

11   creditors, including the Pension Benefit Guaranty Corporation ("PBGC"), losing

12   anywhere from $3 million to $13 million, while post-bankruptcy expenses of

13   Freedom's estate potentially go unpaid; and the recoveries of priority unsecured

14   creditors, such as employees, and general unsecured creditors, such as pre-bankruptcy

15   vendors, may be eliminated completely.  Declaration of James D. Decker, ¶ 6.

16        On the other hand, if this Court denies the emergency relief, the Bankruptcy

17   Court will approve (Tribune submits) Tribune's acquisition of the assets, and the

18   government will remain free to pursue its claims and remedies, with this Court

19   deciding the merits of the government's antitrust objections on a full record. The

20   government does not even attempt to show that litigating this matter on the merits and

on a reasonable schedule would seriously impair its interests, nor could it make such a

showing.

## II. STATEMENT OF FACTS

### A.     The Parties

Defendant Tribune Publishing Company is a diversified media company that

publishes several major local newspapers, niche publications and digital services.  In

Southern California, Tribune Publishing publishes the *Los Angeles Times* and *San

Diego Union Tribune.*

Freedom Communications, Inc. is a media company that owns the *Orange

County Register* and the *Riverside Press-Enterprise.*

### B.     The Bankruptcy and Auction Process

On November 1, 2015, Freedom filed for Chapter 11 bankruptcy protection.

TRO Application at 4.  This was Freedom's second bankruptcy, having previously

filed for Chapter 11 protection in September of 2009.  *See In re Freedom

Communications Holdings, Inc.*, Case No. 09-13046 (Bankr. D. Del. Sept. 1, 2009).

Freedom stated in its first-day bankruptcy pleadings that in the two years prior to its

chapter 11 filing, it incurred losses totaling over $40 million.  Freedom further stated

in its filings with the Bankruptcy Court at the outset of its case that it intended to sell

its business at a public auction supervised by the Bankruptcy Court as quickly as

practicable, and cited its rapidly eroding cash position as the need for that quick sale.

1   Specifically, Freedom has stated repeatedly that by virtue of its cash position and the

2   cash available to it through its Bankruptcy Court-approved financing facility and use

3   of its financiers' cash collateral, a transaction to sell its assets must close no later than

4   March 31, 2016.

5          Freedom accordingly filed a motion to establish procedures for the sale of its

6   assets in the Bankruptcy Court on January 12, 2016.  Declaration of Kenneth P.

7   Kansa, ¶ 3.  That sale was overseen by an independent sales representative appointed

8   by the Bankruptcy Court at Freedom's request.  The Bankruptcy Court approved those

9   procedures by order dated February 5, 2016.  *Id.*  The Bankruptcy Court established a

10  schedule for the sale process, with a diligence process followed by several key dates:

11        • Bidding deadline – March 11, 2016
          • Auction – March 16, 2016
12        • Bankruptcy Court hearing to approve sale – March 21, 2016

13  The schedule above was expressly requested by Freedom for the purpose of closing

14  the sale by March 31, 2016, the date on which Freedom ceased to have access to cash

15  necessary to fund its operations.  Indeed, it was a condition of submitting a qualified

16  bid to purchase Freedom's assets under the Bankruptcy Court-approved sale

17  procedures that the transaction must close by March 31, 2016.  In other words, a party

18  submitting a bid that did not provide for closing by March 31, 2016 (other than on

19  account of customary closing conditions of general applicability) could not submit a

20  bid that was qualified to permit it to participate in the March 16 auction.

1    Tribune conducted significant due diligence regarding the assets being sold.  It

2    identified $24 million in potential cost synergies across several areas including

3    production and operations, editorial, advertising, circulation and marketing and G&A

4    and corporate.  Declaration of William P. Hall, Exhibit A, p. 5.  Tribune's analysis

5    shows that these synergies are far greater than those that would be realized by other

6    interested parties.  *Id.*

7    Tribune's bid was selected as the highest and best bid at the auction by

8    Freedom and the independent sales representative, in consultation with (i) the Official

9    Committee of Unsecured Creditors appointed in Freedom's bankruptcy case, (ii) the

10    Pension Benefit Guaranty Corporation, and (iii) Freedom's post-petition secured

11    lenders.  Declaration of James D. Decker, ¶ 3.  Tribune's overall bid was for

12    approximately $62 million, consisting of $56 million in cash, plus certain assumed

13    liabilities.  *Id.*  The next highest bidder for Freedom's assets bid between $3 million

14    and $13 million less than Tribune, depending upon the resolution of one of its legal

15    objections to the sale.  *Id.*  Contrary to Plaintiff's statements in its motion, there was

16    only one other competing bidder at the auction for all of Freedom's assets.  Tribune is

17    accordingly proceeding into the March 21 sale hearing as the winning bidder.

18    The next step in the sale process is for the Bankruptcy Court to consider

19    approval of the proposed sale to Tribune at the sale hearing on March 21, 2016.

20    **C.    The Industry**

1    Tribune and Freedom sell newspapers and online content to readers, and sell

2    advertising (display advertising and pre-printed inserts) to advertisers.  There are

3    multitudes of other sources that provide content and advertising.  *See* Declaration of

4    Jeff Young, ¶ 4.   In addition to numerous other print publications in Southern

5    California, there are numerous radio and television outlets and a multitude of online

6    sources of content and advertising.

7    In 2011, the Assistant Attorney General in charge of the Antitrust Division

8    recognized that "[t]he advent of the Internet has meant increased competition for

9    readers and advertising dollars."  She noted that this trend, "in combination with other

10   factors, have left many newspapers in perilous financial straits, with a few closing and

11   others forced to undertake drastic cost cutting. . . .  Many new sources of news and

12   commentary are emerging and the Internet has enabled the broader dissemination of

13   news and analysis.  Still, recent developments have caused a number of observers to

14   fear that, if newspapers are unable to put themselves on stronger financial footing, and

15   continue to cut back their coverage or shutter their doors, other media outlets will not

16   fill the journalism gap."  "Dynamic Competition in the Newspaper Industry," Address

17   to The Newspaper Association of America by Christine Varney, Assistant Attorney

18   General, Antitrust Division, U.S. Department of Justice, Available at

19   https://www.justice.gov/atr/speech/dynamic-competition-newspaper-industry.  In

20   making this observation, the Assistant Attorney General acknowledged a fact that

1  fatally wounds Plaintiff's substantive case here – technology has fundamentally

2  altered the place of newspapers in American society.

3  ### III. ARGUMENT

4  #### A.   The Temporary Restraining Order Standard

5  A temporary restraining order is "an extraordinary remedy that may only be

6  awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v.*

7  *Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008).  The purpose of a preliminary

8  injunction is to preserve the status quo and the rights of the parties until a final

9  judgment on the merits can be rendered.  *See U.S. Philips Corp. v. KBC Bank N.V.*,

10  590 F.3d 1091, 1094 (9th Cir. 2010).  The purpose of a temporary restraining order is

11  to preserve the status quo before a preliminary injunction hearing may be held.

12  *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of*

13  *Alameda Cty.*, 415 U.S. 423, 439 (1974); *Johnson v. Macy*, No. CV 15-7165 FMO

14  (ASX), 2015 WL 7351538, at *3 (C.D. Cal. Nov. 16, 2015).  The standard for a

15  temporary restraining order is identical to the standard for a preliminary injunction.

16  *Frontline Med. Assocs., Inc. v. Coventry Healthcare Worker's Comp., Inc.*, 620 F.

17  Supp. 2d 1109, 1110 (C.D. Cal. 2009).  A party seeking injunctive relief must

18  establish that he is (1) likely to succeed on the merits, (2) that he is likely to suffer

19  irreparable harm in the absence of preliminary relief, (3) that the balance of equities

20

1  tips in his favor, and (4) that an injunction is in the public interest.  *Am. Trucking*

2  *Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).[1]

3      Although the elements of this test are "balanced, so that a stronger showing of

4  one element may offset a weaker showing of another," *All. for Wild Rockies v.*

5  *Cottrell*, 622 F.3d 1045, 1049–50 (9th Cir. 2010), *rev'd on other grounds*, 632 F.3d

6  1127 (9th Cir. 2011), the court must find at a minimum that the applicant is "likely" to

7  suffer immediate irreparable injury in the absence of injunctive relief, even if that

8  injury is not of great magnitude.  *Winter*, 555 U.S. at 22.  The applicant bears a high

9  burden of proof in establishing immediate or imminent irreparable harm: "Speculative

10  injury does not constitute irreparable injury sufficient to warrant granting a

11  preliminary injunction.  A plaintiff must do more than merely allege imminent harm

12  sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened

13  injury as a prerequisite to preliminary injunctive relief."  *Caribbean Marine Services*

14  *Co., Inc. v. Baldrige* 844 F.2d 668, 674 (9th Cir. 1988) (emphasis in original) (internal

15  citations omitted); *see also Financial & Sec. Products Ass'n v. Diebold, Inc.* 2005 WL

16  _____

17  [1] Alternatively, "'serious questions going to the merits' and a hardship balance that
    tips sharply toward the plaintiff can support the issuance of an injunction," provided
18  that the plaintiff also shows irreparable harm and that the injunction is in the public
    interest.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011);
19  *SATA GmbH & Co. Kg v. Wenzhou New Century Int'l, Ltd.*, No. CV 15-08157-BRO
    (EX), 2015 WL 6680807, at *3 (C.D. Cal. Oct. 19, 2015).  A "serious question" is one
20  on which the movant "has a fair chance of success on the merits."  *Sierra On-Line,*
    *Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984).

1629813 * 6 (N.D. Cal.) ("Irreparable harm must not be speculative or merely alleged to be imminent . . ."). In the antitrust context, "[r]easonable apprehension of threatened injury" can constitute irreparable harm. *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985); 15 U.S.C. § 26. Nevertheless, the party seeking injunctive relief still "must demonstrate irreparable harm," *id*., by showing "a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Los Angeles Memorial Coliseum Commission v. National Football League*, 634 F.2d 1197,1201 (9th Cir. 1980) (citation and internal quotations omitted). Unsupported allegations without "factual basis" do not suffice. *Id.*

The government approaches its burden of proof under this standard as if this were an ordinary case. In an ordinary case, the court could stay the purchaser from closing on an acquisition for a period of time sufficient to rule on a motion for preliminary injunction. But in this extraordinary case, the emergency relief the government is requesting is equivalent to the permanent relief it intends to seek through injunction proceedings. To support its request for a temporary restraining order, therefore, the government effectively needs to show that it is so likely to win on the merits that there is no real need for discovery or for a hearing on a preliminary injunction. The government has not remotely made that showing. The issues the

1   government seeks to litigate are all subject, at the very least, to substantial dispute,

2   and should be resolved only on a reasonable schedule and a full record.

3   **B.     Plaintiff is Not Likely to Succeed on the Merits**

4        The government challenges this transaction under Section 7 of the Clayton Act.

5   In order to prove a violation under Section 7, a plaintiff must demonstrate that the

6   challenged transaction is likely to "substantially . . . lessen competition or tend to

7   create a monopoly" in a properly defined "market for a particular product in a

8   particular geographic area." *United States v. Baker Hughes Inc.*, 908 F.2d 981, 982-83

9   n.1 (D.C. Cir. 1990).  The government must prove that there is a "reasonable

10  probability" of substantial competitive harm; a mere possibility of harm is insufficient

11  to prove a Section 7 violation.  *United States v. Marine Bancorporation, Inc.*, 418

12  U.S. 602, 616-17, 622-23 (1974) ("§ 7 deals in 'probabilities,' not 'ephemeral

13  possibilities.'") (citing *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 323 (1962)); *U.S. v.*

14  *SunGard Data Sys., Inc.*, 172 F. Supp. 2d 172, 180 (D.D.C. 2001).

15       Plaintiff bears the burden of proving each element of a Section 7 claim.  *Baker*

16  *Hughes*, 908 F.2d at 982-83; *see also FTC v. Tenet Health Care Corp.*, 186 F.3d

17  1045, 1051-52 (8th Cir. 1999); *SunGard*, 172 F. Supp. 2d at 181.  If, on-balance, the

18  transaction is not likely to substantially lessen competition, the government cannot

19  carry its burden. *Baker Hughes*, 908 F.2d at 982-83.

20

1    For over four decades, courts have used a "burden-shifting" framework for

2    evaluating mergers.  Under this framework, the government must establish a

3    cognizable relevant product market, demonstrate market shares that give rise to

4    anticompetitive effects, and show probable adverse effects on customers in the market

5    as a whole. *Id.* at 981.  The government must first establish a prima facie case to

6    obtain a presumption that the merger will substantially lessen competition. *California*

7    *v. Am. Stores Co.*, 872 F.2d 837, 841-42 (9th Cir. 1989), *rev'd on other grounds,* 495

8    U.S. 271 (1990).

9    The government establishes a prima facie case by proof of (a) the relevant

10   product market; (b) the relevant geographic market; and (c) that the merger will

11   produce "undue concentration" in the relevant market.

12   The burden of persuasion rests, at all times, with the government. *United States*

13   *v. Baker Hughes Inc.*, 908 F.2d 981, 982 (D.C. Cir. 1990); *FTC v. H.J. Heinz,* 246

14   F.3d 708, 715 (D.C. Cir. 2001); *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098,

15   1175 (N.D. Cal. 2004).  The government will not be able to established any aspect of

16   its prima facie case here.

17                    **1.    Plaintiff Is Not Likely to Succeed on Its Proposed Relevant**
                             **Market**

18   In order to prove anticompetitive effect, the government must establish the

19   relevant product market.  *FTC v. Freeman Hosp.*, 69 F.3d 260, 268 (8th Cir. 1995);

20   *see also FTC v. Swedish Match*, 131 F. Supp. 2d 151, 156 (D.D.C. 2000); *United*

- 13 -

1  *States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1111 (N.D. Cal. 2004) (quoting from

2  *HCA v. FTC*, 807 F.2d 1381, 1386 (7th Cir 1986)); *United States v. Engelhard Corp.*,

3  970 F. Supp. 1463, 1466 (M.D. Ga. 1997), *aff'd*, 126 F.3d 1302 (11th Cir. 1997).

4        To determine the relevant product market, courts consider whether two products

5  serve the same purpose, are reasonably interchangeable, and whether and to what

6  extent purchasers substitute one product for another.  *Brown Shoe Co. v. U.S.*, 370

7  U.S. 294, 325 (1962); *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1074 (D.D.C. 1997).

8        Customers need not replace one product with another for the products to be

9  competitive and in the same relevant product market. That other products affect the

10  price of a particular product is sufficient to put those other products in the same

11  market, even if customers continue to use the particular product. Rather, the test of

12  market definition turns on reasonable substitutability. This requires the court to

13  determine whether or not products have "reasonable interchangeability" based upon

14  "price, use and qualities." *Oracle*, 331 F. Supp. 2d at 1131 (citing *U.S. v. E. I. du Pont*

15  *de Nemours & Co.*, 351 U.S. 377, 404 (1956)).  Differences in product characteristics

16  are not a sufficient basis to exclude products from the market. *See Oracle*, 331 F.

17  Supp. 2d at 1120 (citing *In re Super Premium Ice Cream Distrib. Antitrust Litig.*, 691

18  F. Supp. 1262, 1268 (N.D. Cal. 1988) (Legge, J.), *aff'd sub nom.*, *Haagen-Dazs Co.*

19  *v. Double Rainbow Gourmet Ice Creams, Inc.*, 895 F.2d 1417 (9th Cir. 1990)); *IGT v.*

20  *Alliance Gaming Corp.*, 702 F.3d 1138, at 1346-47 (Fed. Cir. 2012).  Changes in the

industry must also be considered in defining the relevant market. *U.S. v. Syufy Enters.*, 712 F. Supp. 1386-87, 1397 (N.D. Cal. 1989), *aff'd*, 903 F.2d 659 (9th Cir. 1990) (rejecting narrow market definition where "the government has given little, if any, consideration to the vast and rapid technological changes in the industry").

Based on these legal principles, it is clear that a proposed relevant product markets focused on newspaper circulation or advertising would be far too narrow. The government cites ancient newspaper cases such as *U.S. v. Times Mirror Co.*, 274 F. Supp. 606 (C.D. Cal. 1967), *Times-Picayne Publ'g Co. v. U.S.*, 345 U.S. 594 (1953) and *U.S. v. Citizen Publ'g Co.*, 394 U.S. 131 (1969), to support its case.  But we have been through an information revolution (or even revolutions) since those cases were decided.  As early as 15 years ago, at roughly the same time as Google was founded, Judge Walker in analyzing the merger of the only two major daily papers in San Francisco (*The San Francisco Examiner* owned by Hearst and the *San Francisco Chronicle*) noted that:

> Changes in markets for information and advertising since 1965 raise serious questions about plaintiff's ability to make a prima facie showing. Since the inception of the [Joint Operating Agreement], the market power of a newspaper firm dominant in San Francisco has been drastically reduced by (1) a steep increase in available sources of information and advertising, such as radio, television and the Internet, and (2) the expansion of the geographic market in which the SFNA newspapers compete to include the eleven counties in the San Francisco Bay area."

1
2
3
4
5
6
7

   Since inception of the JOA, the presence and importance of non-newspaper media in the market for information has exploded. In 1965, broadcasting outlets in metropolitan markets were few in number. San Francisco had four VHF TV stations, one of which was at the time of trial still owned by CPC. In 1965, UHF stations had relatively short reach and provided no effective competition for VHF stations. Radio was primarily on the AM band. FM stations were few in number and provided mostly programming of limited appeal (for example, classical music). Cable television was largely confined to rural areas, imported distant signals only rather than originating programming and carried little advertising. The Internet was science fiction in 1965.

8
9

   In 1999, there were thirty-two AM stations, forty-three FM stations and twenty-eight television stations broadcasting in the San Francisco Bay area. Cable television imports a multitude of distant signals and provides a plethora of specialized cable programming and advertising.

10
11
12
13
14

   The Internet has opened a staggering array of news sources. With relative ease, a person can select from a host of suppliers of newspaper-like news, features and opinions. Most major newspapers have web sites making it possible to access a substantial part of their content on line. An Internet user can design a unique individually tailored on-line newspaper by roaming all news content servers and selecting stories and subjects of interest. These new media provide new outlets for advertisers as well. "Banner" advertisements have become commonplace on news and shopping web sites.

15
16
17
18
19
20

*Reilly v. Hearst Corp.*, 107 F. Supp. 2d 1192, 1200 (N.D. Cal. 2000).  In the fifteen years since then, the number of options has not only increased dramatically, but the pace of technological change has accelerated.  The Internet has exploded with new news and information sites.  If readers want news on any particular topic, they can look to Google News, Apple News, numerous search engines, or various media.  For local news in Orange County, they can turn to numerous on-line local sources.  For

leading national or international news, they can easily look to a world of sources, from the *New York Times* to CNN's web site to the *Financial Times* or BBC in London to sites in most every major city.  For business news, they can easily click on the *Wall Street Journal* or MarketWatch or CNBC or Forbes or Yahoo Business.  For classifieds they can look to Craigslist.  For better or worse, the Court and the government need only look at the phone in their pocket to understand that the trend torward digital content is accelerating.

These new sources of competition, along with the old ones, have had dramatic effect on newspaper revenues.  Freedom is in bankruptcy for the second time in less than a decade.  The *Los Angeles Times* has seen its advertising revenue fall significantly.  The government's definition of the "relevant market" as English-speaking daily local newspapers in the Orange County (or Riverside County) area ignores reality and common experience.  In light of its unusually-restrictive definition of the "relevant market", the government does not have a probability of succeeding on the merits.

### 2.   Plaintiff Is Unlikely to Be Able to Demonstrate High Market Shares or a Substantial Increase in Concentration

Antitrust law is concerned when acquisitions lead to significant increases in levels of concentration.  However, courts have long recognized that in a dynamic market, historical market shares are not meaningful predictors of future competitive harm. *U.S. v. General Dynamics Corp.*, 415 U.S. 486, 498 (1974) (quoting *Brown*

*Shoe*, 370 U.S. at 321-22 & n.38).

In this case, the government has provided high market share figures, but those figures are premised on a faulty market definition and are thus unreliable. Market share calculations based on unreliable data and analysis predicated on those shares should be rejected. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 n.19 (1986); *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242-43 (1993) (*citing Matsushita*, 475 U.S. at 594 n.19); *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 995-97 (C.D. Cal. 2012).

### 3.    Plaintifff Is Unlikely to Be Able to Demonstrate Anticompetitive Effects

The government, like any antitrust plaintiff, must show that the challenged conduct (here, an acquisition) harms the competitive process. *Oracle*, 331 F. Supp. 2d at 1123. This means harm to the "market *as a whole*," not to individual market participants. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 31 (1984), *abrogated on other grounds by Illinois Tool Works, Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) (emphasis added); *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 97 (2d Cir. 1998). *See generally Syufy*, 903 F.2d at 668 ("It can't be said often enough that the antitrust laws protect competition, *not* competitors."). Moreover, courts must consider the evidence of enhanced efficiency in the context of the competitive effects of the merger. *See FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1054-55 (8th Cir. 1999). Here, Tribune's acquisition will result in substantial efficiencies that should

1  bring stability to the operations of the *Orange County Register* and *Riverside Press*

2  *Enterprise* that they have sorely lacked for many years, and that give these papers the

3  best chance of succeeding and serving the public well into the future.

4       The government will not be able to show harm to the competitive process from

5  the transaction.  The *Los Angeles Times* and the *Orange County Register* are not close

6  substitutes.  They are two very different papers, in content and in circulation footprint.

7  The *Los Angeles Times* is a large multi-county metropolitan paper, whereas the

8  *Orange County Register* is single-county suburban newspaper.  The acquisition

9  simply allows the combined entity to operate more efficiently, without any harm to

10  competition.

11      **C.**    **The Public Will Not Suffer Irreparable Harm**

12       The government's allegation that the public will suffer irreparable harm absent

13  a TRO does not hold up.  The government first alleges that injury should be presumed,

14  as if to avoid this factor altogether.  But injury cannot be presumed where it has not

15  been shown that  Section 7 has been violated in the first place.  The government also

16  states that the public will be harmed by the lost competition between the newspapers.

17  But as noted above, the *Los Angeles Times* and the *Orange County Register* do not

18  compete head-to-head.  The papers are very different in geographic reach and content.

19  Declaration of William P. Hall, Exhibit A, 3; *see also* Declaration of Jeff Young, ¶¶ 5,

20  6.  The *Los Angeles Times* is a major metropolitan newspaper with far-reaching local

1   coverage in numerous communities throughout Southern California, while the *Orange*

2   *County Register* is a suburban newspaper with local coverage focused primarily on

3   Orange County.  The *Los Angeles Times* simply does not consider the *Orange County*

4   *Register* when making competitive decisions on circulation and advertising.

5   Declaration of William P. Hall, Exhibit A; *see also* Declaration of Bill Yawman, ¶¶ 6-

6   10.  Because they are not direct competitors, the threat of public harm if the papers

7   had access to each others' competitively sensitive information evaporates.

8         The government also argues that in the absence of a TRO there is a risk that the

9   court would be unable to order an adequate and effective remedy if they ultimately

10   prevail.  There are several problems with this argument.  First, the government's only

11   argument in this regard is a laundry list of things that any buyer of a business might do

12   in any business transaction – operate the business, access information, and take other

13   actions that the current owners of the business could take right now.  *See*

14   Memorandum in Support of Ex Parte App. at 16-18.  Mere speculation cannot rise to

15   the level of irreparable injury.   Second, it penalizes Tribune for the government's

16   delay in investigating this transaction.  Articles regarding Tribune's interest in

17   Freedom have been published for months in major newspapers that the DOJ regularly

18   monitors.  Moreover, the government has been quite successful recently in getting

19   effective remedies following a challenge to a consummated merger.  *See* Justice

20   Department and Bazaarvoice Inc. Agree on Remedy to Address Bazaarvoice's Illegal

1    Acquisition of PowerReviews, reprinted at https://www.justice.gov/opa/pr/justice-

2    department-and-bazaarvoice-inc-agree-remedy-address-bazaarvoice-s-illegal-

3    acquisition; *United States v. Bazaarvoice, Inc.*, No. 13-cv-00133, 2014 U.S. Dist.

4    LEXIS 180347 (N.D. Cal. Dec. 2, 2014).  While Tribune believes that the government

5    will not ultimately prevail in this action in any event, it is clear that the government

6    has not carried its burden to demonstrate irreparable harm at this stage in the

7    proceedings.

8        **D.    The Balance of Equities Tips Decidedly Against the Grant of A TRO**

9            While the alleged harm to the government of not granting the TRO is

10   speculative, the harm to Tribune and to the interest of hundreds, if not thousands, of

11   Freedom's creditors from granting the TRO is real and certain.

12           Freedom Communications is deeply insolvent and currently party to a chapter

13   11 case pending in the Central District of California, its second in four years.

14   Freedom has stated repeatedly in the Bankruptcy Court that its capital needs and

15   access to cash collateral of its lenders require it to close a sale of its assets by March

16   31.  Declaration of Kenneth P. Kansa, Ex. F.  As a practical matter, the sale of

17   Freedom's assets must close by March 31 or the business faces potential liquidation.

18   The Bankruptcy Court recognized this fact in establishing a marketing and sale

19   process for Freedom's business that included an auction on March 16, 2016, a sale

20   hearing on March 21, 2016, and an anticipated closing on or before March 31, 2016.

1    At the March 16, 2016 auction, Tribune was the high bidder for Freedom's

2  assets, with an overall bid of approximately $62 million in cash and assumed

3  liabilities.  Declaration of James D. Decker, ¶ 3.  The next highest bidder for

4  Freedom's assets bid between $3 million and $13 million less than Tribune,

5  depending upon the resolution of one of its objections to the sale.[2]  *Id.*  Tribune's

6  agreement to buy Freedom's assets is effectively committed to close on or before

7  March 31 absent few exceptions.  *Id.* ¶ 6.

8    The claims against Freedom's bankruptcy estate substantially exceed either

9  party's bids.  *See id.* ¶¶ 4, 5. This means that any decline in the amount paid for

10  Freedom's assets takes money from Freedom's creditors.  Under the Bankruptcy

11  Code's priority scheme, the losses are not distributed evenly.  Senior secured

12  creditors, for example, must be paid in full before junior secured creditors and

13  unsecured creditors recover anything on their claims.  *Id.*  In this case, Tribune's bid

14  allows for a full recovery to the senior-most secured creditor (Silver Point Capital

15  LLC), as well as a full recovery to the Pension Benefit Guaranty Corporation, which

16  holds approximately $16.2 million in claims against Freedom's bankruptcy estate on

17

18  [2] The competing bidder asserted that Tribune Publishing's bid should not have been
permitted under the auction rules because of the Department of Justice's investigation

19  into Tribune Publishing's potential acquisition of Freedom's business, and that as a
result, the competing bidder should have faced no competition at the auction.  If that
position were accepted, Tribune Publishing expects the competing bidder to contend

20  that it should only have to pay $49 million for Freedom's assets.

account of its secured claims against Freedom relating to missed contributions to Freedom's pension plan (The Retirement Plan of Freedom Communications, Inc.). *Id.* ¶ 5.  Expenses incurred by Freedom during the post-bankruptcy period and priority unsecured claims, such as claims by employees of Freedom for unpaid benefits accrued as of Freedom's bankruptcy filing, would also likely be paid in full, and general unsecured creditors may receive a modest recovery, all as a result of the Tribune bid.  *Id.*

A TRO here destroys much of this value permanently, and materially reduces the recoveries of Freedom's creditors.  If Tribune cannot close by March 31 – the date on which Freedom has told the Bankruptcy Court it must close the sale or risk liquidation – then Freedom must revert to the next bidder's back-up bid, which affords between $3 million and $13 million less value to Freedom's bankruptcy estate. Declaration of James Decker, ¶ 6.  If that happens:

- the Pension Benefit Guaranty Corporation loses up to $3.6 million;
- post-bankruptcy expenses of Freedom's estate may go unpaid; and
- the recoveries of priority unsecured creditors, such as employees, and general unsecured creditors, such as pre-bankruptcy vendors, may be eliminated completely.  *Id.*

Issuance of a TRO irreparably harms not only Tribune but Freedom's creditors, Freedom's employees, and the United States.  The government dismisses this harm for several reasons, all of them wrong.  First, the government says that Tribune and Freedom can simply continue their current competing operations for a limited time.

1   Memorandum in Support of Ex Parte App. at 19.  No, they cannot – Freedom has said

2   repeatedly that its access to cash stops on March 31.  Second, the government says the

3   harm to Freedom's creditors is limited because "Freedom's assets can be sold to either

4   of the other bidders in the bankruptcy auction."  *Id.*  Perhaps, but at a much lower

5   price, with the burden of that lower price to be borne by the creditors.  The

6   government cannot pretend that harm does not exist.

7         The government, in asking for a TRO and claiming it simply needs time to

8   understand the transaction and further information, misses the point.  Freedom's

9   business lacks funding for operations past March 31 and the business must be sold in

10  accordance with the schedule set long ago by the Bankruptcy Court.  If it is not sold to

11  Tribune, it will be sold to another party that provides less value to creditors.  Issuance

12  of a TRO here is not a temporary preservation of the status quo, but permanently

13  deprives creditors of their recoveries.  In some cases, such as the PBGC's, that may be

14  the loss of millions of dollars.  In other cases, such as employee recoveries for unpaid

15  vacation time or similar benefits, a TRO may be the difference between full recovery

16  on a claim and no recovery at all.

17        **E.    The Government Has Long Known About the Potential Transaction**

18        The government argues that a TRO is justified here because "Plaintiff United

19  States only recently became aware of Tribune's efforts to acquire Freedom".

20  Application for Ex Parte App. at 4.  This cannot be true.  Tribune's potential to

1   acquire Freedom's assets has been mentioned in the media as far back as the very first

2   press reports of Freedom's bankruptcy filing on November 1, 2015 – over four and a

3   half months ago.  Tribune stated its interest in acquiring Freedom's assets in open

4   court as far back as November 4, 2015 – just three days later.  The motion to start the

5   Bankruptcy Court's sale process for Freedom's assets was filed on January 13, 2016 –

6   over two months ago.  Even if the government had waited until then to investigate a

7   potential acquisition of Freedom's assets by Tribune, it could have obtained over 60

8   days to conduct an investigation.

9       Instead, the government admits that it was not until March 14, 2016 – over four

10   months into Freedom's bankruptcy, nearly two months into the sale process, and two

11   days before the Bankruptcy Court auction for Freedom's assets – that it communicated

12   its concern about "serious antitrust issues" to Freedom and Tribune.  The government

13   cannot use its own delay in starting to investigate this transaction as justification for

14   the extraordinary relief of a TRO, particularly when that TRO will eliminate millions

15   of dollars in recoveries for Freedom's creditors.

16                              **IV. CONCLUSION**

17       Plaintiff's application for a temporary restraining order should be denied.

18

19

20

Dated:        March 17, 2016

SIDLEY AUSTIN LLP


By:_____
   Peter K. Huston

Attorneys for Tribune Publishing
Company