# EXHIBIT A

1  PETER K. HUSTON (SBN 150058)
   phuston@sidley.com
2  MENESH PATEL (SBN 241072)
   menesh.patel@sidley.com
3  Sidley Austin LLP
   555 California Street, Suite 2000
4  San Francisco, California 94104
   Telephone: (415) 772-1200
5  Facsimile: (415) 772-7400

6  WILLIAM BLUMENTHAL (pro hac vice to be filed)
   wblumenthal@sidley.com
7  KAREN KAZMERZAK (pro hac vice to be filed)
   kkazmerzak@sidley.com
8  Sidley Austin LLP
   1501 K Street, N.W. #600
9  Washington, D.C. 20005
   Telephone: (202) 736-8000
10 Facsimile: (202) 736-8711

11 BRADLEY ELLIS (SBN 110467)
   bellis@sidley.com
12 KIMBERLY DUNNE (SBN 142721)
   kdunne@sidley.com
13 MARK HADDAD (SBN 205945)
   mhaddad@sidley.com
14 HELENA TSEREGOUNIS (SBN 287422)
   htseregounis@sidley.com
15 Sidley Austin LLP
   555 W Fifth Street #4000
16 Los Angeles, California 90013
   Telephone: (213) 896-6000
17 Facsimile: (213) 896-6600

18 Attorneys for Defendant Tribune Publishing Company

19                 UNITED STATES DISTRICT COURT

20                 CENTRAL DISTRICT OF CALIFORNIA

21                         WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cv-01822 |
| Plaintiff, | |
| v. | **DEFENDANT TRIBUNE PUBLISHING COMPANY'S SUR-REPLY TO PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER** |
| TRIBUNE PUBLISHING COMPANY, | |
| Defendant. | |

1  The government's reply brief asks the Court to ignore actual harm that a TRO
2  would cause to Freedom's creditors and rather focus on speculative harm to
3  newspaper consumers in Riverside and Orange counties.  The government
4  dismissively refers to an additional $3 million that the creditors would receive if
5  Tribune's bid is approved.  Yet we now know from pleadings filed with the
6  Bankruptcy Court by the other bidder that the figure is much higher – more than $13
7  million.  This morning, the sole competing bidder for Freedom's assets (Digital First
8  Media) stated in a filing with the Bankruptcy Court that "the amount of DFM's bid for
9  the Assets . . . should not be in excess of the amount set forth in its original Stalking
10 Horse APA."  *See* MediaNews Group, Inc. d/b/a Digital First Media's Opposition to
11 Tribune Publishing Company's Motion to (I) Deny Stalking Horse Bid Protections,
12 and (II) Clarify Non-Applicability of Stalking Horse Status, at 6 n.4, Case No. 8:15-
13 bk-15311-MW (Bankr. C.D. Cal.) [Doc. No. 494].  If Digital First Media's argument
14 in this respect prevails, then the difference in value between Tribune's bid and the
15 competing bid is more than $13 million.  As stated in the Decker Declaration (at ¶ 6)
16 attached to Tribune's Opposition, that money comes out of recoveries to the Pension
17 Benefit Guaranty Corporation, holders of priority claims such as employee claims,
18 and effectively wipes out guaranteed recoveries to general unsecured creditors.

19 Focusing instead on the alleged harm to newspaper consumers, the
20 government's reply brief largely just repeats the ipse dixit that the market is limited to
21 newspapers, essentially ignoring the revolution in content delivery and advertising
22 platforms that has unfolded over the past three decades.  While the government has
23 the burden to show a relevant product and geographic market, they have no support
24 for their definition except for 50 year old cases.  On the other hand, Tribune's
25 declarants have shown in detail why this merger is not anti-competitive.

26 The DOJ perseveres in insisting that Tribune "never alerted the United States"
27 about Tribune's interest in acquiring Freedom.  That simply is not correct: <u>The
28 government of the United States is chairman of the Creditors Committee in the</u>

SUR-REPLY IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR TRO

<u>bankruptcy proceeding</u>. In particular, the Pension Benefit Guarantee Corporation, an agency of the US government, sits as chairman. It is the largest creditor of the bankrupt estate, it was present at the auction that awarded Freedom to Tribune and expressed no objection, and it has been copied on most pleadings since the outset of the bankruptcy proceeding. It has been aware of Tribune's interest for months.

The government states that "absent a TRO, Tribune would be able to take steps to integrate the *Register* and *Press-Enterprise*—steps that would be difficult or impossible to reverse later." Reply at 7. It notes that "Tribune's own planning documents show that Tribune plans to fire large numbers of employees after the merger—and to substantially reorganize the combined papers' printing and newsroom operations" and that Court could not later "unscramble the eggs" and restore the Register and Enterprise to the competitive position they are in today. *Id.*

These points do not support a TRO. There is no dispute that the current situation with *Orange County Register* and *Riverside Press-Enterprise* is untenable. With respect to job losses, the DOJ has no evidence that another buyer could avoid them. That omission is fatal to the DOJ's point, because the debtor is hemorrhaging red ink and absent the sale it would need to be liquidated. Thus, regardless of who acquires the assets, the exigencies of the situation require that the changes will need to be made at the papers. The only question is how many of the former employees the new owner can rehire and DOJ has no evidence that another buyer will rehire more employees than Tribune will. In fact, Tribune, which can take advantage of backroom synergies, is in the best position to allow the papers to continue as going concerns and to keep the newsrooms and the distinct voices of these papers as intact as possible.

Moreover, the government's argument that the court cannot "unscramble the eggs" ignores the broad powers the court would have in the unlikely event that the government was successful on the merits after a trial. Courts are empowered to order any relief that is "necessary to eliminate the effects of an acquisition offensive to the statute." *United States v. Coca-Cola Bottling Co. of Los Angeles*, 575 F.2d 222, 229

(9th Cir. 1978).  While the scope of the relief will vary based on the facts of the case, courts are "invested with large discretion to model their judgments to fit the exigencies of the particular case." *Int'l Salt Co. v. United States*, 332 U.S 392, 400-01 (1947).

And the government has successfully invoked these powers in the past.  For example, the Northern District of California, at the DOJ's urging, recently ordered comprehensive relief including divestitures in order to restore competition in the ratings and review market following a merger trial.  *See* Justice Department and Bazaarvoice Inc. Agree on Remedy to Address Bazaarvoice's Illegal Acquisiton of PowerReviews, reprinted at https://www.justice.gov/opa/pr/justice-department-and-bazaarvoice-inc-agree-remedy-address-bazaarvoice-s-illegal-acquisition; *United States v. Bazaarvoice, Inc.*, No. 13-cv-00133, 2014 U.S. Dist. LEXIS 180347 (N.D. Cal. Dec. 2, 2014).  And the District of Columbia District Court, at the FTC's urging, ordered comprehensive relief including divestitures in the media context.  *See* Final Order and Stipulated Permanent Injunction, reprinted at https://www.ftc.gov/enforcement/cases-proceedings/9910323a/hearst-trust-hearst-corporation-first-databank-inc.

The DOJ also argues that it merely "seeks to preserve the status quo of having two significant competitors publishing newspapers in Orange and Riverside Counties."  Reply Br. 3.  But the DOJ misdefines the "status quo" as "having two significant competitors," and that is inconsistent with established Ninth Circuit precedent defining status quo as "the last, uncontested status which preceded the pending controversy."  *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009).  The status quo that DOJ presumes is the continued independent operation of Freedom Communications.  But it is undisputed that Freedom Communications will face liquidation if a sale does not close by March 31.  This case, therefore, presents a difficult situation in which there is no way to "freeze[] the positions of the parties." *Id.* (internal quotation marks omitted) (quoting *Heckler v.*

*Lopez*, 463 U.S. 1328, 1333 (1983)). Granting the relief requested by the government here would be equivalent to entering an order requiring Freedom to be acquired by the backup bidder Digital First Media, and this "goes well beyond simply maintaining the status quo [p]endente [l]ite." *Id.* An injunction that goes beyond maintaining the status quo in the way that the government's requested relief would be tantamount to a "mandatory injunction," which is "particularly disfavored." *Id.*; *see also Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994). The standard for granting this "disfavored" remedy is heightened: "When a mandatory preliminary injunction is requested, the district court should deny such relief unless the facts and law **clearly favor the moving party**." *Stanley*, 13 F.3d at 1320 (internal quotation marks omitted) (emphasis added). These injunctions are "not issued in doubtful cases" and denied "unless extreme or very serious damages will result." *Marlyn*, 571 F.3d at 879. As demonstrated in Tribune's opposition, this case is not only "doubtful," but the best outcome for both the private parties *and* the public is to allow approval of the sale to move forward.

Dated: March 18, 2016

SIDLEY AUSTIN LLP

By: /s/ Peter K. Huston
    Peter K. Huston
Attorneys for Tribune Publishing Company

SUR-REPLY IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR TRO
4

213787979