UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>TRIBUNE PUBLISHING COMPANY,<br><br>　　　　　Defendant. | Case No. CV 16-01822-AB (PJWx)<br><br>**ORDER GRANTING APPLICATION FOR A TEMPORARY RESTRAINING ORDER** |

　　　Before the Court is the United States of America's ("government") Ex Parte Application for a Temporary Restraining Order ("TRO") (Dkt. No. 5.), filed, along with the Complaint (Dkt. No. 1), on March 17, 2016. Defendant Tribune Publishing Company ("Tribune") filed an Opposition, and the government filed a Reply on March 18, 2016. (Dkt. Nos. 12, 16.)[1] Upon consideration of the papers, the Court **GRANTS** the application.

---

[1] At 6:30 p.m. on March 18, 2016, Tribune filed an Ex Parte Application to File a Sur-Reply. (Dkt. No. 17.) The Court GRANTS that application. However, the court has reviewed Tribune's sur-reply and it does not change the analysis herein.

1.

## I. BACKGROUND

The papers set forth the relevant background in detail. The Court will provide only a summary. Tribune owns the *Los Angeles Times*. The government seeks an order enjoining Tribune from finalizing its acquisition of Freedom Communications, Inc. ("Freedom") and its publications, the Orange County *Register* and the Riverside County *Press-Enterprise*. Tribune was the winning bidder – out of two or three bidders – for Freedom's assets in a bankruptcy auction held March 16, 2016 and is scheduled to seek bankruptcy court approval of its acquisition on March 21, 2016. The government argues that the acquisition would immediately end competition between Tribune and Freedom for readers and advertisers in Orange and Riverside counties, leaving Tribune with a monopoly in the market for English-language daily local newspapers in these counties. The government contends that this is prohibited by Section 7 of the Clayton Act, 15 U.S.C. § 18, and seeks to enjoin the acquisition to preserve the status quo pending a motion for preliminary injunction.

## II. APPLICABLE LEGAL STANDARDS

### A. Standard for a Temporary Restraining Order

A temporary restraining order is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). The purpose of a preliminary injunction is to preserve the status quo and the rights of the parties until a final judgment on the merits can be rendered. *See U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010). The purpose of a temporary restraining order is to preserve the status quo before a preliminary injunction hearing may be held. *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda City.*, 415 U.S. 423, 439 (1974); *Johnson v. Macy*, No. CV 15-7165 FMO (ASX), 2015 WL 7351538, at *3 (C.D. Cal. Nov. 16, 2015). The standard for a temporary restraining order is identical to the standard for a preliminary injunction. *Frontline Med. Assocs., Inc. v. Coventry Healthcare Workers Comp., Inc.*, 620 F. Supp. 2d 1109, 1110 (C.D. Cal. 2009).

Specifically, a party seeking preliminary injunctive relief must establish that he is (1) likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest. *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).

Alternatively, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support the issuance of an injunction," provided that the plaintiff also shows irreparable harm and that the injunction is in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011); *SATA GmbH & Co. Kg v. Wenzhou New Century Int'l, Ltd.*, No. CV 15-08157-BRO (Ex), 2015 WL 6680807, *3 (C.D. Cal. Oct. 19, 2015). A "serious question" is one on which the movant "has a fair chance of success on the merits." *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984).

The elements of this test are "balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies*, 622 F.3d 1045, 1049–50 (9th Cir. 2010), *rev'd on other grounds*, 632 F.3d 1127 (9th Cir. 2011). However, the applicant must *demonstrate* that immediate or imminent irreparable harm is likely: "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction. A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Svcs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (emphasis in original) (internal citations omitted); *see also Fin. & Sec. Prods. Ass'n v. Diebold, Inc.*, Case No. C 04-04347 WHA, 2005 WL 1629813, * 6 (N.D. Cal. Jul. 8, 2005) ("Irreparable harm must not be speculative or merely alleged to be imminent . . . ."). In the antitrust context, "[r]easonable apprehension of threatened injury" can constitute irreparable harm. *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985); *accord* 15 U.S.C. § 26. Nevertheless, the party seeking injunctive relief still

"must demonstrate irreparable harm," *id.*, by showing "a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197,1201 (9th Cir. 1980) (citation and internal quotations omitted). Unsupported allegations without "factual basis" do not suffice. *Id.*

### B. Elements of a Clayton Act Violation

The government challenges the transaction under Section 7 of the Clayton Act. To prove a violation of Section 7, a plaintiff must demonstrate that the challenged transaction is likely to "substantially . . . lessen competition or tend to create a "monopoly" in a properly defined "market for a particular product in a particular geographic area." *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 982–83 n.1 (D.C. Cir. 1990). The government must prove that there is a "reasonable probability" of substantial competitive harm; a mere possibility of harm is insufficient to prove a Section 7 violation. *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 616–17, 622–23 (1974) ("[Section] 7 deals in 'probabilities,' not 'ephemeral possibilities.'") (citing *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 323 (1962)); *United States v. SunGard Data Sys., Inc.*, 172 F. Supp. 2d 172, 180 (D.D.C. 2001). If, on balance, the transaction is not likely to substantially lessen competition, the government cannot carry its burden. *Baker Hughes*, 908 F.2d at 982–83.

Courts evaluate mergers under a "burden-shifting" framework by which the government must (1) establish a cognizable relevant product market, (2) demonstrate market shares that give rise to anticompetitive effects, and (3) show probable adverse effects on customers in the market as a whole. *Id.* at 981. If the government establishes these elements, there arises a presumption that the merger will substantially lessen competition. *California v. Am. Stores Co.*, 872 F.2d 837, 841–42 (9th Cir. 1989), *rev'd on other grounds,* 495 U.S. 271 (1990).

If the government establishes a prima facie case, the burden then shifts to the defendant to produce evidence rebutting the presumption. *Baker Hughes*, 908 F.2d at

982–83.  If the defendant successfully rebuts the presumption, the burden of producing additional evidence of anticompetitive effect shifts to the government and merges with the ultimate burden of persuasion, which remains with the government at all times.  *Id.*

### III.   DISCUSSION

**A. The Government Has Established a Likelihood of Success on the Merits of Its Claim.**

Having reviewed the parties' submissions, the Court finds that the Government has shown a likelihood of success on the merits of its claim.

**1. The Government Is Likely to Establish Its Proposed Relevant Market.**

To prove anticompetitive effect, the government must establish the relevant market, which consists of two components: a product market and a geographic market.  *FTC v. Freeman Hosp.*, 69 F.3d 260, 268 (8th Cir. 1995).  The relevant product market establishes the boundaries within which competition meaningfully exists.  Those "commodities reasonably interchangeable by consumers for the same purposes" constitute a product market for antitrust purposes.  *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956).  The relevant market "must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn."  *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 612 n.31 (1953); *see also Brown Shoe*, 370 U.S. at 325 (product markets are delineated "by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it").  A relevant geographic market is an "area in which the seller operates[] and to which the purchaser can practically turn for supplies."  *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 359 (1963) (internal quotation marks and emphasis omitted).

Here, the government defines the relevant *product* market as "the sale of Daily English-language local daily newspapers to subscribers and the sale of local advertising in those newspapers."  *See* TRO 10:14–16, *and* Exh. B (Decl. of Robin Allen).  In

particular, the government notes that readers and advertisers are not likely to find local newspapers in *other languages* to be reasonably interchangeable with local English-language newspapers.

The government defines the relevant *geographic* market as Orange County and Riverside County. The government argues that English-language newspapers *from elsewhere* are not likely to be interchangeable with English-language newspapers in Orange and Riverside counties because the former "do not regularly provide local news specific to that county, nor do they have any significant circulation or sales inside Orange County." *See* TRO 13:8–11. And, although the *Los Angeles Times* provides news about and has circulation in these Counties, this fact does not ameliorate but instead exacerbates the potential anticompetitive effects of the acquisition because Tribune also owns the *Los Angeles Times*. In its Reply, the government claims that over 200,000 residents of Orange and Riverside Counties buy daily newspapers.

Tribune does not contest that local newspapers provide local content and local advertising. Instead, it argues that the government's market definition fails to account for internet-based sources of local news and advertising as potential competition in the relevant product market and that therefore the government's market definition is too narrow. *See, e.g.*, *Reilly v. Hearst Corp.*, 107 F. Supp. 2d 1192, 1201 (N.D. Cal. 2000) (noting that the internet "has opened a staggering array of news sources" and that "[w]hile a merger of the two dominant San Francisco dailies in 1965 might well have posed an unquestionable threat of undue concentration of market power under the old paradigm, that threat today is far from clear."). If the government's relevant market definition is not sound, then its prima facie case collapses.

The Court is not convinced of Tribune's position that the internet renders geography and distinctions between kinds of news sources obsolete. In *Reilly,* Judge Walker questioned whether the geographic scope of the market for San Francisco newspapers was in fact broader than San Francisco. But Judge Walker's discussion cited, in addition to the influence of the internet, the presence of other nearby local

6.

1  papers, the region's recent population explosion, and the availability of other free-
2  distribution newspapers as factors suggesting a broader market.  *See Reilly*, 107 F. Supp.
3  2d at 1200–01.  In addition, Judge Walker issued his order after a court trial with a fully-
4  developed record.  Thus, *Reilly* is of little assistance to Tribune.

5        Meanwhile, Tribune has not meaningfully rebutted the government's market
6  definition.  Tribune states in conclusory fashion that "[f]or local news in Orange County,
7  [readers] can turn to numerous on-line local sources," *see* Opp'n 16:17–20, without
8  identifying any such sources.  Tribune also states that readers can turn to Google News,
9  Apple News, "numerous search engines, or various media," *id.*, for news on any
10 particular topic, but to the Court's knowledge neither Google News, Apple News, nor
11 "search engines" themselves *generate* local content.  Rather, news aggregator sites
12 primarily post links to stories on the websites of other content generators – including
13 local newspapers like the *Register* or the *Press-Enterprise*.  That other websites post
14 links to local sites only demonstrates that local newspapers continue to serve a unique
15 function in the marketplace: they are the creators of local content.  It further stands to
16 reason that local advertisers in search of print advertising would choose to advertise with
17 local news providers.  To be sure, there are other "sources" of local news such as
18 bloggers and the like, but Tribune neither argues nor demonstrates that consumers
19 consider the content or advertising they provide as "reasonably interchangeable" with
20 what the local English-language newspapers provide.

21       The Court is therefore satisfied that the government is likely to establish its
22 proposed relevant product market.

23       **2.  The Government Is Likely to Demonstrate That the Acquisition**
24           **Would Have Anti-Competitive Effects and Adverse Effects on the**
25           **Consumers in the Market.**

26     "[A] merger which produces a firm controlling an undue percentage share of the
27 relevant market, and results in a significant increase in the concentration of firms in that
28 market[,] is so inherently likely to lessen competition substantially[,] that it must be

enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." *Philadelphia National Bank*, 374 U.S. at 363; *see also id.* at 364 ("Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat."); *United States v. Bazaarvoice, Inc.*, No. 13-cv-00133-WHO, 2014 WL 203966, at *68-70 (N.D. Cal. Jan. 8, 2014) (finding that "the government established that the combined market shares of [the merging parties] far exceeds 30 percent, and is in excess of 50 percent," which "easily made a prima facie showing of a Section 7 violation").

Here, the government has shown that, based on the above relevant market definition, Tribune's acquisition of the *Register* will increase its control of local daily newspaper circulation from 41 percent to 98 percent in Orange County, and Tribune's acquisition of the *Press-Enterprise* and *Register* would increase its share of local daily newspapers from 12 percent to over 81 percent in Riverside County. Tribune only contests the government's relevant market definition, but does not meaningfully dispute these figures. Under the cases cited above, such a concentration clearly constitutes a threat to competition and would likely have adverse effects on consumers in the market as whole. The government will therefore likely establish these elements.

The government has therefore shown a likelihood of success on the merits of its Clayton Act claim.

### B. The Government Has Established a Likelihood of Irreparable Harm, That an Injunction is in the Public Interest, and That the Balance of Hardships and Equities Tips in Its Favor.

"In a Government case the proof of the violation of law may itself establish sufficient public injury to warrant relief." *California v. Am. Stores Co.*, 495 U.S. 271, 295 (1990); *see also United States v. Siemens Corp.*, 621 F.2d 499, 506 (2d Cir. 1980) ("[O]nce the United States demonstrates a reasonable probability that § 7 has been violated, irreparable harm to the public should be presumed."); *United States v. Ingersoll-Rand Co.*, 218 F. Supp. 530, 544 (W.D. Pa. 1963) ("The Congressional

pronouncement in § 7 embodies the irreparable injury of violations of its provisions.").

Even absent a presumption, the government has established a likelihood of irreparable harm. Should an injunction not issue, Tribune would acquire the *Register* and *Press-Enterprise* and undertake all of the business actions – consolidating operations, taking ownership of business-sensitive information, terminating employees, etc. – that normally accompany mergers. It would be very difficult – if not impossible – to unwind these actions, so the court could not grant an effective remedy in should the government ultimately prevail. *See Consol. Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 261 (2d Cir. 1989) (irreparable harm established where merged firm would "dominate" the market and the acquired firms "would cease to be viable competitors in the market"); *F&M Schaefer Corp. v. C. Schmidt & Sons, Inc.*, 597 F.2d 814, 818 (2d Cir. 1979) (finding irreparable harm because acquisition would allow defendant immediately to "have access to the confidential trade information of one of its leading competitors" and lead to the "risk of decreased organizational morale" of the acquired firm); *United States v. Ivaco, Inc.*, 704 F. Supp. 1409, 1429 (W.D. Mich. 1989) ("If an injunction is denied and the transaction is later found to violate the Act, then the remedy would be a divestiture of acquired assets," but "[t]hat remedy is typically rejected by the courts as ineffective" as it "would not effectively remedy the injury to competition threatened by this transaction."). The Court is simply not convinced by Tribune's attempt to downplay the significance of this potential harm.

The public interest and the balance of hardships inquiries are interrelated and both weigh in favor of an injunction. "By enacting Section 7, Congress declared that the preservation of competition is always in the public interest." *Ivaco*, 704 F. Supp. at 1430; *see also F.T.C. v. Swedish Match*, 131 F. Supp. 2d 151, 173 (D.D.C. 2000) ("There is a strong public interest in effective enforcement of the antitrust laws . . . ."). The Court finds this especially applicable here where the consumer access to local news is at stake. Newspapers – indeed, local ones – are important to a healthy democracy. Tribune claims that it would be harmed because it would not be able to consummate its

purchase before Freedom runs out of financing on March 31, 2016 and the second place bidder would make the purchase instead.  It may be that Tribune will lose the opportunity to acquire the *Register* and *Press-Enterprise* in favor of the second place bidder.  However, this private harm does not outweigh the public interest in the preservation of competition, especially given the government's likelihood of success on the merits.  *See, e.g., Ivaco*, 704 F. Supp. at 1430 ("This private, financial harm must, however, yield to the public interest in maintaining effective competition."); *United States v. Columbia Pictures Indus., Inc.*, 507 F. Supp. 412, 434 (S.D.N.Y. 1980) ("Far more important than the interests of either the defendants or the existing industry. . . is the public's interest in enforcement of the antitrust laws and in the preservation of competition. The public interest is not easily outweighed by private interests."); *Siemens Corp.*, 621 F.2d at 506 (in Section 7 cases brought by the Government, "private interests must be subordinated to public ones").  That the government enforces antitrust law on behalf of the public interest necessarily weighs heavily in the balance-of-hardships calculus.  Furthermore, Tribune could have avoided the risk of harm altogether by vetting the acquisition with the government ahead of time.  Finally, the government seeks to preserve the status quo pending a resolution of its case on the merits, thereby avoiding harm to the marketplace that otherwise appears likely.

Some cases discuss the "balance" analysis as the balance of equities.  Insofar as the balance of equities is distinct from the balance of hardships, it also tips in the government's favor.  Tribune faults the government for not interjecting itself into the allegedly well-publicized potential acquisition earlier, while the government faults Tribune for not notifying it of its intentions.  Perhaps both sides could have anticipated antitrust problems sooner and dealt with them on some basis other than on an application for a TRO resolved in a matter of hours.  Indeed, Tribune evidently anticipated potential antitrust issues long ago because it secured antitrust counsel, yet it appears that it failed to vet its intentions with the government voluntarily.  The Court finds that the government's alleged eleventh-hour enforcement of the antitrust law and the arguable

prejudice this causes Tribune does not influence the equities or outbalance the paramount importance of the public interest. The balance of the equities therefore strongly favors the government.

The likelihood of irreparable harm, the public interest, and the balance of hardships and equities weigh in favor of an injunction.

### IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Government's Ex Parte Application for a Temporary Restraining Order.

**IT IS HEREBY ORDERED** that, pending a hearing for determination of an Order to Show Cause Why a Preliminary Injunction Should Not Issue, Defendant Tribune Publishing Co., and all of its respective agents, employees, or attorneys, shall be and hereby are **RESTRAINED AND ENJOINED** from acquiring any portion of the assets of Freedom Communications, Inc., or in any way taking control of or gaining access to the assets of Freedom Communications, Inc.

Under Fed. R. Civ. Proc. 65(b)(2), a TRO must expire no later than 14 days after the time it is issued unless the court extends it for good cause. Therefore, the Court hereby **SETS** a hearing on the government's request for an Order to Show Cause Why a Preliminary Injunction Should Not Issue for **Monday, March 28, 2016, at 10:00 a.m.**

Dated: March 18, 2016

_____
HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE